CASE 1—PETITION ORDINARY—DECEMBER 16, 1864.

# Board Int. Imp. Shelby Co. vs. Scearce.

*APPEAL FROM SHELBY CIRCUIT COURT.*

1. It is the duty of a turnpike company to have bridges wherever the safety or convenience of travel requires. *Willful* neglect of this duty means a knowledge by the company of the insufficiency of its bridge for that end, and a voluntary failure to remedy the defect; and a palpable and perilous defect, discoverable by ordinary vigilance, might authorize the presumption of such knowledge and neglect.

2. The charter of a turnpike company (or other corporation) is a contract, with legal obligations, protected by the Constitution against any legislative impairment; but the act of 1854, for the redress of injuries arising from the neglect or misconduct of railroad companies (*Sess. Acts*, 1853-4, *p*. 175), is not such impairment, and is constitutional.

3. See the opinion for a statement of the facts, which show that the turnpike company was not guilty of *willful* negligence in failing to repair a bridge; and that the verdict of the jury finding such negligence was against the evidence.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

On the 21st of December, 1865, Miss Ann Mary Scearce, traveling toward Shelbyville with Miss Adelia Tinsly, and John McCormick sitting between them as driver, lost her life by the precipitation of the buggy by the affrighted horse against and over one of the balustrades of a bridge of the turnpike corporation styled " The Board of Internal Improvement for Shelby County." Her personal representative brought this suit against the corporation for the recovery of

damages according to the third section of the Kentucky statute of the 10th of March, 1854 (*Sess. Acts, p.* 175), which is in these words: "That if the life of any person or persons is lost or destroyed by the *willful* neglect of another person or persons, company or companies, corporation or corporations, their agents or servants, then the personal representative of the deceased shall have the right to sue such person or persons, company or companies, corporation or corporations, and recover *punitive* damages for the loss or destruction of the life aforesaid."

The first section of the same act, applying to railroads exclusively, authorized a similar remedy for *compensatory* damages only when death had resulted from simple "negligence or carelessness."

The first section, being entirely remedial, should be construed liberally; but the third section, being chiefly penal, should be interpreted more strictly. Mere neglect, however culpable, is not a crime. *Willful* neglect—jeoparding life— is, when it is the occasion of death, often a crime, and always may be treated as *quasi* criminal. The first may be only a private, the last a public, wrong.

Willful neglect and wanton neglect are nearly synonymous —each implying either actual malice or anti-social recklessness. This is clearly what the statute contemplated in its discrimination between "negligence" in the first, and "*willful* neglect" in the third section.

Then, as it was the duty of the appellant to have bridges wherever the safety or convenience of travel in its road required, and to so construct and preserve them as to secure travelers against the incidental accidents to which *ordinary* use of them may be liable, *willful* neglect of this duty necessarily means a *knowledge by the company of the insufficiency of its bridge for that end; and, after the lapse of a reasonable time, a voluntary failure to remedy the defect, and a palpable and perilous defect, which any competent judge of such a structure could discover by ordinary vigilance,* might authorize a presumption of such knowledge and willful neglect. In an action under the

authority of the third section, no dama_,es can be recovered without proof of such *delictum* as that just defined.

On an issue made up by a traverse of the charge of "willful neglect," the jury found a verdict for $2,000, and the circuit court, overruling a motion for a new trial, rendered judgment for the amount assessed.

In elaborate arguments to prove the unconstitutionality of the third section, the counsel of the appellant urge that the charter being a contract, that section impairs its obligations by making the corporation liable for what, by the terms of the compact and the cotemporaneous law, it was exempt from. This assumption we deem indefensible. That the charter was a contract with legal obligations, protected by the Constitution against any legislative act impairing them, is freely admitted. The legal obligation of a contract is neither more nor less than a right to employ legal remedy to enforce or *uphold* the rights and duties of the parties to the contract. Wherever there is a legal remedy, there is a legal obligation; and wherever there is no legal remedy, there is no legal obligation. It is, therefore, right to remedy at the date of the contract, which imparts to it all its legal obligation and defines its character; and, consequently, any retroactive statute which attempts to abolish all remedy, or so to modify the existing remedy for enforcement or protection as to suspend it, or make it less efficacious and availing, would destroy or impair the legal obligation. But as the obligation, which is the effect, and the remedy, which is the cause, are distinct and different things, no change in the remedy which does not make it less effectual could impair the obligation; nor is it possible for legislation to impair the obligation of a contract without an essential and deteriorating operation on the remedy.

Now, how does this doctrine as to the obligation of contracts, and the unconstitutional impairment of it, apply to the road charter and the third section of the said act of 1854?

The act of incorporation does not guarantee to the company impunity for crime which any public statute might denounce against all persons, natural and artificial, or against

all artificial persons, or all even of the class to which it belongs. Nor does it exempt the corporation from legal liability for any of its wrongs, positive or negative.

The third section imposes no new duty; it does not declare wrong any act or omission which was right before its enactment; it does not declare unlawful anything before lawful. It only gives a remedy for wrong which was irremediable in that mode at the date of the charter; and there is nothing in the charter, express or implied, which sheltered the corporation from such civil responsibility for a great moral wrong. Moreover, nothing in any such charter, so far as we have ever seen, exempts the artificial any more than a natural person from police laws enacted at any time for the security of the lives, persons, or property of the citizens. This has been too often adjudged, and is too clearly reasonable, to be now gravely doubted. And, among other illustrations of the principle and policy of this doctrine, just such an enactment as our third section, in just such a case as this, has been adjudged constitutional. (*See Pierce on American Railroad Law, pp.* 40–1–2, *and the adjudged cases therein cited.*)

We, therefore, consider the statute constitutional, and the action, as brought, maintainable on sufficient proof of the indispensable facts; and perceiving no substantial error in instructions either given or refused, the only question remaining for consideration is, whether or not the circuit court erred in overruling the motion for a new trial on the general ground that the evidence did not authorize the verdict. This court, in an ordinary suit for damages for a tort, would not presume to overrule a jury in its estimate of the testimony when it furnishes any rational foundation for the verdict. The jury is the final judge of the preponderance of evidence, except in criminal or penal cases, when the verdict is against the defendant, and, in the opinion of the court, it decidedly preponderated in his favor. We consider this a penal case, though prosecuted for the benefit of the estate of the deceased girl. The vital element indispensable to recovery, is *willful* wrong; mere involuntary negligence is not enough. To justify

the verdict, not only must the death have resulted from a negligent defect in the railing of the bridge, but the corporation must be presumed to have had a knowledge of the defect, and to have willfully forborne to remedy the infirmity.

The testimony, as certified by the bill of exceptions, shows the following facts:

1. The buggy-horse was rather intractable, and, being what is called "moon-eyed," would scare at his own shadow.

2. The driver, though hampered by a lady on each side of him, drove into the bridge in a trot.

3. The horse, when nearly over, became, without any known cause, so affrighted as to jump suddenly out of the track, and, throwing its whole weight with all its animal power against the railing, broke it, and fell with the buggy and its contents nearly twenty feet to the ground below.

4. The bridge, as constructed at the time of the accident, had been used for more than twenty years without any disaster, and had been but recently renovated in such a manner as to have been considered better and safer than ever before.

5. The workmen who did this last job testified that it was well and faithfully executed. And one of the directors, who was a superintendent of the road, inspected the bridge, and concurred with the mechanics who did the work.

6. One of the upright posts supporting the railing was broken by the shock, and appeared at the fracture "somewhat doated;" but it does not appear that there was, while it stood, any external sign of decay.

7. Only two of many witnesses expressed the opinion that the construction of the bridge was defective or unsafe; and they seemed to think that it had always been so.

8. The description of the railing by the witnesses could not enable a court or jury to decide that it was not apparently sufficient for security in the expected and ordinary use of the bridge by prudently traveling over it, or to authorize the presumption that the company or its agents knew, or ought to have known, that it was insufficient for that purpose.

On these facts two questions arise:

1. Was the bridge essentially deficient in any respect?

2. Was the defect, if any, either in material or construction, such to authorize the belief that the corporation or any of its agents knew it, and willfully and unreasonably neglected to correct it?

In our judgment, the testimony did not authorize an affirmative answer to either of these questions:

1. The sufficiency of a bridge is a relative idea, and depends on the locality, the size, and the object of the structure. A bridge over a river, and especially such an one as the Ohio, would be expected to be, and ought to be, much stronger and more enduring than a short *viaduct* over a streamlet or small ravine. And it is neither expected nor necessary that such small bridges, to be used as portions of a turnpike-road, should be of iron, or of any unusual style of pontitecture. Tried by this test, the little bridge in question was apparently equal, in material and adaptation, to the average quality of bridges of the like size and for the like purpose elsewhere in Kentucky, or any other State. If there was anything unusual in it, the deviation was in the style and mechanism of the railing. But this is not proven by any witness, nor, as before suggested, does the description given in the record tend to prove it. Autopsy alone could prove it satisfactorily. The only deficiency proved was the secret decay of one of the uprights.

2. Unless the construction be such as to indicate to a competent judge of such structures a fatal deficiency in the railing for safety against ordinary pressure, in the prudent use of the bridge (and there is no proof that it was so), the corporation should not be presumed to have known it, and, in not knowing it, was not guilty of "willful neglect" or punitive dereliction of duty; and as the defect in one of the uprights was latent, there is no proof that the corporation knew, or even ought to have known, that the railing was not sufficient to guard against ordinary accidents in ordinary use; and the corporation is not an insurer against reckless travelers nor against extraordinary accidents, which might result from only extraordinary causes.

Then, however seriously the dispassionate mind may doubt whether a majority of turnpike bridges, as short as this, have been more safely constructed than it appeared to be; or whether the tragic accident shall be ascribed most to the fault of the driver and horse, or to that of the railing; or whether any common turnpike bridge could withstand such unexpected and extraordinary force, are all questions we may leave to the jury; and still we are of the opinion, that, however they ought to be, or might be decided by right reason, there is yet a total destitution of evidence to convict the appellant of the *scienter* indispensable to *"willful neglect."*  The verdict was not only unauthorized by the evidence, but was against the instructions by the court.

Consequently, with our construction of the law and interpretation of the testimony, we cannot sustain the verdict nor the judgment of the circuit court upon it.

Wherefore, the judgment is reversed, and the cause remanded for a new trial according to the principles of this opinion.